# United States Court of Appeals
## For the First Circuit

No. 09-1606

UNITED STATES EX REL. PATRICK LOUGHREN,

Relator, Appellee,

v.

UNUM GROUP,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before

Torruella, Circuit Judge,
Souter, Associate Justice,[*]
and Stahl, Circuit Judge.

William J. Kayatta, Jr., with whom Catherine R. Connors,
Geraldine G. Sanchez, Mark Porada and Pierce Atwood LLP were on
brief for appellant.
Colette G. Matzzie with whom Claire M. Sylvia, Peter B.
Krupp, Phillips & Cohen LLP and Lurie & Krupp LLP were on brief
for appellee.

July 29, 2010

---

[*]The Hon. David H. Souter, Associate Justice (Ret.) of the
Supreme Court of the United States, sitting by designation.

**STAHL**, **Circuit Judge**. Patrick J. Loughren ("Relator") brought suit under the <u>qui</u> <u>tam</u> provisions[1] of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729 et seq., alleging its violation by Unum Group ("Unum") and co-defendant Genex Services, Inc. ("Genex").[2] On appeal, Unum challenges the district court's denial of its motion for judgment as a matter of law, the court's exclusion of certain evidence, and the court's instructions to the jury on the element of scienter. After a thorough review, we affirm the district court's denial of Unum's motion for judgment as a matter of law, but find that the court abused its discretion in excluding certain evidence that is highly relevant to one of the elements necessary to prove Unum's liability. Consequently, we vacate and remand for a new trial.

## I. Background

Unum is a provider of long term disability insurance ("LTD") policies. In his complaint as ultimately amended, Relator asserted that Unum and Genex were liable under the FCA for knowingly causing their insureds to file baseless applications for Social Security Disability Insurance ("SSDI"), thereby burdening

---

[1]The <u>qui</u> <u>tam</u> provisions permit a private citizen (called a relator) to bring a civil action under the statute "for the person and for the United States Government . . . in the name of the Government." 31 U.S.C. § 3730(b)(1).

[2]At the time the complaint was filed, Genex was a wholly-owned subsidiary of Unum, specializing in Social Security Administration claims. Genex is not a party to this appeal.

the Social Security Administration ("SSA" or "Agency") with the time and expense required to deny such claims. Under 31 U.S.C. § 3730(b)(4), the government declined to prosecute the case.

At issue at trial were seven SSDI applications made by six different Unum LTD benefits recipients. At the conclusion of evidence, the district court denied Unum's motion for judgment as a matter of law, save for a claim relating to one individual to whom the SSA belatedly awarded SSDI benefits.

The jury returned a verdict against Unum on two of the remaining claims, those filed by Unum LTD recipients named Jennine and George, awarding damages of $425 "per proven false claim," for a total of $850. With respect to the remaining four claims, the jury returned a verdict in Unum's favor on three and deadlocked on the fourth. The district court denied Unum's renewed motion for judgment as a matter of law.

Rather than proceeding to try the Relator's claims relating to 55 additional allegedly false claimants, the district court directed entry of final judgment against Unum on the SSDI applications filed by George and Jennine, trebling the $850 in damages to $2,550 and awarding the maximum statutory penalty of $11,000 for each of the two claims as provided under the FCA, 31

U.S.C. § 3729(a); 28 C.F.R. § 85.3(a)(9), for a total award of $24,550.[3]

## II. Facts

### A. Applying for SSDI

To receive disability insurance benefits under the Social Security Act, an applicant must be suffering from a "disability," 42 U.S.C. § 423(a)(1), that is, an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The applicant's physical or mental impairment must be

> of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A). An applicant is deemed able to engage in "substantial gainful activity" if he is capable of doing any job that pays above a specific dollar amount set by SSA regulations. At the time of trial, that amount was $940 per month.

---

[3]The issue of Relator's attorney's fees, which he has estimated to be roughly $11 million, is yet to be ruled on by the district court, and is not part of this appeal.

To obtain a disability determination by the SSA, an individual must submit several related forms, including an Application for Disability Insurance Benefits (Form SSA-16-F6) (the "application form") and a Disability Report -- Adult (Form SSA-3368-BK) (the "disability report"). The application form asks the applicant to provide basic background information, employment history, and family information. In question five, it asks the applicant to specify the time period during which the applicant has been "unable to work."[4] The form instructs applicants that they will be responsible for providing "medical evidence showing the nature and extent of [their] disability." Though the application form does not include a definition of "disability," the disability report explains how the term "disability" is defined by the Agency. It states:

> You will be considered disabled if you are unable to do any kind of work for which you are suited and if your disability is expected to last (or has lasted) for at least a year or to result in death. So when we ask, "when did you become unable to work," we are asking when you became disabled as defined by the Social Security Act.

The application form explains that an applicant has the responsibility to "promptly notify" the SSA of certain events which "may affect [the applicant's] eligibility or disability benefits as

---

[4]Specifically, question 5(a) asks: "When did you become unable to work because of your illnesses, injuries or conditions?" The form then instructs the applicant to write the appropriate month, day, and year.

provided in the Social Security Act."  For example, if the applicant "go[es] to work," or if his "medical condition improves so that [he] would be able to return to work, even though [he has] not yet returned to work," he must report that information to the Agency.  The application form further requires the applicant's signature below the following warning:

> I know that anyone who makes or causes to be made a false statement or representation of material fact in an application or for use in determining a right to payment under the Social Security Act commits a crime punishable under Federal law by fine, imprisonment or both.  I affirm that all information I have given in this document is true.

## B. Unum's Practices

Unum's LTD polices typically provide partial income replacement to insureds who are unable to perform the material and substantial duties of their "own occupation."

Evidence was introduced at trial that most of Unum's LTD group policies had a 180-day elimination period, before which an insured was not eligible for Unum's LTD benefits.  At the end of that 180-day period, Unum assessed whether a claimant was eligible to receive benefits under the claimant's LTD insurance policy. Unum made that assessment using an "own occupation" standard for eligibility, asking whether the claimant was "able to perform [the] occupation that [he was] doing at the date that [he] first had [his] disability."

After the expiration of the "own occupation" period under the policy (typically two years), a claimant needed to show that he was incapable of performing "any occupation" in order to continue to receive benefits. To assess whether a claimant was disabled under its "any occupation" standard, Unum would ask whether, based on the claimant's training, education, and experience, and given his restrictions and limitations, the claimant was capable of working in an occupation that could pay him sixty percent or more of his predisability earnings. SSA's evaluation of whether an applicant is capable of performing "substantial gainful activity" is similar, and, in fact, was referred to as "the Social Security Administration's 'any occupation' eligibility requirement" at trial; however, Unum's "any occupation" analysis is less rigorous than the SSA's "any occupation" analysis. When the SSA evaluates whether an applicant is capable of performing "substantial gainful activity," it does not limit the sphere of jobs which the applicant is capable of doing based on the applicant's predisability earnings.

The Unum policies at issue here provide that Unum could reduce the amount it paid to an insured by, among other things, the amount the insured received or was entitled to receive as disability payments under the SSA. Under the language of Unum's insurance contract, an insured need not have actually received (or even applied for) an SSDI award in order for Unum to deduct the

estimated amount of the award. Evidence at trial suggested that Unum had a general practice of requiring claimants seeking LTD benefits to file an application for SSDI as soon as they had been disabled for six months.[5] At that point, Unum would send claimants a "Payment Option Form," which explained that the claimant should apply for SSDI, and while his application was pending, he could choose to (1) have approximately 50% of his Unum LTD insurance benefits withheld as an offset against the award Unum estimated he was entitled to receive from the SSA; or (2) receive full benefits with the understanding that if he were awarded SSDI retroactively, he would owe an overpayment to Unum. If a claimant decided not to apply for SSDI, Unum could, and did, exercise its power to immediately reduce the claimant's benefits by the amount of the SSDI award Unum estimated he was entitled to receive.

Though Unum was familiar with the difference between its own "own occupation" standard and the SSA's more rigorous "any occupation" standard, Unum made no efforts to determine whether a claimant met the SSA's "any occupation" standard of eligibility before telling the individual that his benefits would be cut if he did not apply for SSDI.

---

[5]Some witnesses indicated this practice occurred after a five-month period of disability.

## 1. George

George was a heavy equipment operator who was fifty-three at the time he applied for long-term disability benefits. For years, George had been legally blind in his left eye due to a detached retina from an old football injury. He filed his claim with Unum after he suffered a stroke in April 2004. The stroke had caused blurred vision in the lower right quadrant of his right eye.

George's claim file contained an assessment from his physician that George was unable to work around machinery, and, more generally, that because he was unable to see clearly, he was "unable to perform any duties." However, Unum also knew that even with his impairment, George walked ten to twenty miles daily. Additionally, Unum had information that George had graduated from high school and gone on to attend college for a little over two years, yet the claims handler who processed George's claim, Thomas Brasel, had not determined whether the blurred vision in George's right eye impaired his ability to read.

Brasel approved George's claim on August 23, 2004, under Unum's "own occupation" standard, on the theory that "with [George's] vision issues and the fact that he had to work heavy machinery, those two weren't compatible." Brasel made no assessment at that time of George's ability to do other occupations.

Initially, George advised Unum that he had already applied for SSDI; however, when Brasel ultimately learned that George had not applied, he told George that he had to do so. Brasel testified that he believed, at the time, that George was eligible for SSDI benefits.[6] George filed for SSDI on October 21, 2004. SSA denied George's application on January 11, 2005, on the ground that he had a capacity for substantial gainful activity.

## 2. **Jennine**

Jennine was a 38-year-old pediatric nurse who developed left (non-dominant) arm, neck, and back pain after a car accident with an 18-wheeler on May 10, 1999. Jennine had unsuccessful carpal tunnel surgery three months later. Jennine was then scheduled to have surgery on her shoulder on September 22, 1999. In August prior to the surgery, Jennine's physician reported to Unum that the prognosis for her recovery after the surgery was good and that her condition was expected to improve in three to four months.

---

[6]Brasel stated that he "anticipated that [George] would be out for at least a year, which would give him the minimal qualifications for review. And then when you're looking at 'any occ[upation]' capacity, I didn't believe that he had the capacity to work in something else. . . . [H]e was fifty-three. He had been doing one job for the last thirty odd years, and his job required vision. He was legally blind in one eye. He had blurred vision from a stroke. That being said, with his limited work history, I didn't see it." Brasel later testified on cross-examination that no assessment was ever made of George's ability to do occupations other than his own.

On September 30, 1999, a week after Jennine's surgery, Unum received a document from Jennine describing her symptomology. Jennine indicated that she was having difficulty with the full function of her left arm and stated that she was unable to work because of what she described as "severe" pain. Nonetheless, that same day, the Unum claims handler noted that Jennine "may improve" with additional treatment and that Jennine "has work capacity now." The claims handler requested a vocational review, and Unum's vocational specialist added this notation to Jennine's file, also dated September 30, 1999:

> Please consider a rehab referral when appropriate as this young individual would have non-patient care alternatives once she recovers from shoulder surgery scheduled for September 22nd and possibly even light patient care alternatives depending on the extent of her recovery.

Also on that day, Unum approved Jennine's insurance claim and sent her a Payment Option Form, instructing her to file for SSDI or face a reduction in her benefits.

Jennine was familiar with SSDI eligibility requirements because of her background as a nurse, and she told Unum that she did not qualify for SSDI benefits. She further informed Unum of her intention to return to work.

Nonetheless, Jennine applied for SSDI on October 20, 1999. When the clerk at the Social Security office asked her why she was applying (because "it did not look like [Jennine was]

-11-

qualified"), Jennine told her that her "disability insurance company required [her] to apply."

Jennine returned to work as a pediatric nurse coordinator in April 2000. After Jennine informed the SSA of her return to work, the Agency denied her application for SSDI.

## III. Analysis

The FCA "covers all fraudulent attempts to cause the government to pay out sums of money." United States ex rel. Conner v. Salina Regional Health Center, Inc., 543 F.3d 1211, 1217 (10th Cir. 2008). While the government can bring an action under the FCA, 31 U.S.C. § 3730(a), the Act also provides for a private individual to file suit on a qui tam basis "in the name of the Government." 31 U.S.C. § 3730(b)(1); see also United States ex rel. Lissack v. Sakura Global Capital Markets, Inc., 377 F.3d 145, 152 (2d Cir. 2004).

At trial, the jury considered whether Unum violated two provisions of the FCA, those which impose liability on:

> [a]ny person who –
> (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval; [or]
> (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government . . . .

31 U.S.C. § 3729(a)(1)-(2) (2008).[7]  The jury was instructed that

        [7]In 2009, Congress passed the Fraud Enforcement and Recovery
Act ("FERA"), Pub. L. No. 111-21, 123 Stat. 1617 (2009), which
amended and renumbered these provisions as §§ 3729(a)(1)(A) and
(a)(1)(B), respectively, see FERA § 4(a), 123 Stat. at 1621.  The
amendment to section 3729(a)(2), but not the amendment to section
3729(a)(1), was made retroactive to June 7, 2008, applicable to
"all claims under the False Claims Act . . . that [were] pending on
or after that date."  FERA § 4(f), 123 Stat. at 1625.  There is
disagreement among our sister circuits as to whether Congress
intended the amended section 3729(a)(2) to be applied retroactively
to actions, like this one, pending as of June 7, 2008, see United
States ex rel. Kirk v. Schindler Elevator Corp., 601 F.3d 94, 113
(2d Cir. 2010), or rather to pending "claim[s]" as defined by 31
U.S.C. § 3729(b)(2)(A) (i.e., "any request or demand . . . for
money or property"), see Hopper v. Solvay Pharm., Inc., 588 F.3d
1318, 1327 n.3 (11th Cir. 2009); United States v. Science
Applications Intern. Corp., 653 F. Supp. 2d 87, 106-07 (D.D.C.
2009).  Under the prior definition, the amended section 3729(a)(2)
would apply in this case; under the latter definition, the former
version would apply.
        We need not decide whether the FERA applies retroactively here
because under either the former or amended version of section
3729(a)(2), our analysis of Relator's claims against Unum will be
the same.  As Unum notes, "under both versions, [Relator] was
required to prove falsity, materiality, and scienter."
        Moreover, Unum was not harmed by the fact that the jury was
instructed under the prior version of the statute.  The primary
difference between the former and amended versions of the provision
is the replacement of the phrase "to get" with the word "material."
As we discuss further in Section III.B.2, the FERA amendments to
the FCA were responding, in part, to the Supreme Court's suggestion
in Allison Engine Co., Inc. v. United States ex rel. Sanders, 553
U.S. 662, 128 S.Ct. 2123 (2008), that section 3729(a)(2) contained
an intent requirement, and by striking the words "to get," Congress
intended to eliminate that requirement.  S. Rep. No. 111-10, at 11
(2009).  That change is not particularly relevant here.  The
"intent requirement" which Allison Engine read into section
3729(a)(2) was in the context of a party submitting a false
statement not directly to the government, but to a private third
party (as in the case of a subcontractor and prime contractor).
The Court explained that the subcontractor would only violate
section 3729(a)(2) if it had the intent that the statement be used
by the prime contractor to get the Government to pay its claim.
Id. at 2130.  There is no question in this case that Unum caused
the statements at issue to be made directly to the government; thus

-13-

to establish a violation of the FCA, Relator had to prove that a false or fraudulent claim was submitted to the United States, that Unum had the requisite scienter, and that Unum caused the submission of the claim.  The district court further instructed that the Relator must prove that the allegedly false statement contained within the claim (that the applicant was "unable to work" or "disabled") was material to the SSA's decision whether to pay or approve the claim.

## A. Materiality

### 1. Materiality Requirement

We have long held that the FCA is subject to a judicially-imposed requirement that the allegedly false claim or statement be material.  See United States v. Data Translation, Inc., 984 F.2d 1256, 1267 (1st Cir. 1992) (citing Turner v. Johnson & Johnson, 809 F.2d 90, 95 (1st Cir. 1986), for the proposition that materiality is "established as an element of common law fraud").  Recently, the Supreme Court found that a materiality requirement applies in the context of sections 3729(a)(2) and (a)(3).  See Allison Engine Co., Inc., 128 S.Ct. at 2126, 2130.

Allison Engine's intent requirement and its abrogation by FERA, are not relevant here.

For the remainder of this opinion, we will cite to the 2008 version of section 3729(a)(2).  The elements of the provision, for the purpose of this case, are the same, and as the 2008 version was the version with which the jury was charged and on which it evaluated Unum's liability, it is the more appropriate version here.

-14-

Though the Court did not consider the application of a materiality requirement to subsection (a)(1), we see no reason why <u>Allison Engine</u> should disturb our previous reading of a materiality requirement into the statute more generally.[8]  <u>See</u> 1 John T. Boese, Civil False Claims and Qui Tam Actions § 2.04, 2-171-72 (3d ed. 2006 & Supp. 2010).

As the Supreme Court has held, "[i]n general, a false statement is material if it has 'a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed.'"  <u>Neder</u> v. <u>United States</u>, 527 U.S. 1, 16 (1999) (quoting <u>United States</u> v. <u>Gaudin</u>, 515 U.S. 506, 509 (1995)).  Many of our sister circuits have employed that definition in the FCA context, <u>see, e.g.</u>, <u>United States ex rel. Longhi</u> v. <u>United States</u>, 575 F.3d 458, 468-70 (5th Cir. 2009); <u>United States ex rel. Sanders</u> v. <u>North American Bus Indus., Inc.</u>, 546 F.3d 288, 297 (4th Cir. 2008) (citations omitted); <u>United States</u> v. <u>Bourseau</u>, 531 F.3d 1159, 1171 (9th Cir. 2008), and it is the definition Congress recently adopted when it amended the FCA.  <u>See</u> 31 U.S.C. § 3729(b)(4) ("the term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.").  It is also the standard that the district

---

[8]We reach the same conclusion regarding Congress's 2009 amendment to the former section 3729(a)(2), incorporating an explicit materiality requirement in place of the "to get" language that the Supreme Court relied upon in its decision limiting liability in <u>Allison Engine</u>.

court employed in instructing the jury, and both parties agree that standard was the correct one.  Accordingly, we will find that the statement reporting the date that the applicant was "unable to work" was material if it had a natural tendency to influence or was capable of influencing the SSA's decision whether or not to award SSDI benefits.

## 2. Standard of Review

We review the denial of a motion for judgment as a matter of law, including legal decisions made therein, de novo.  Burke v. McDonald, 572 F.3d 51, 57 (1st Cir. 2009) (citations omitted).  As for matters of fact, "we view the evidence in the light most favorable to the verdict, asking only whether a rational jury could on the basis of that evidence find as the jury has."  Id. (citation omitted).  "[A] jury's verdict and factual findings 'must be upheld unless the facts and inferences viewed in the light most favorable to the verdict point so strongly and overwhelmingly in favor of the movant that a reasonable jury could not have returned the verdict.'"  Mass. Eye and Ear Infirmary v. QLT Phototherapeutics, Inc., 552 F.3d 47, 57 (1st Cir. 2009) (citations omitted).

Unum contends that our review on the issue of materiality should "fall squarely on the non-deferential side of the review continuum," arguing that materiality here involves "alleged misrepresentations to public officers and parsing of the SSA regulatory framework," and is thus a law-dominated question.  In

-16-

support of this argument, Unum cites <u>United States ex rel. Berge</u> v. <u>Board of Trustees of the University of Alabama</u>, 104 F.3d 1453 (4th Cir. 1997), in which the Fourth Circuit held that the determination of materiality in the FCA context, "although partaking the character of a mixed question of fact and law, is one for the court."[9] <u>Id.</u> at 1460.

As the Supreme Court has stated, the issue of materiality is a mixed question of law and fact, "involving as it does the application of a legal standard to a particular set of facts." <u>TSC Indus., Inc.</u> v. <u>Northway, Inc.</u>, 426 U.S. 438, 450 (1976); <u>see</u> <u>also</u> <u>In re Stone & Webster, Inc., Sec. Litig.</u>, 414 F.3d 187, 209 (1st Cir. 2005) (stating, in the securities fraud context, that the materiality of a false statement is a question for the jury).[10] As

---

[9]Unum also cites <u>United States ex rel. A+ Homecare, Inc.</u> v. <u>Medshares Mgmt. Group, Inc.</u>, 400 F.3d 428 (6th Cir. 2005), in which the Sixth Circuit affirmed the lower court's holding, in denying summary judgment for defendant, that a false statement was material as a matter of law. <u>Id.</u> at 441, 446-47.

[10]We acknowledge that the Supreme Court has also observed that "the characterization of a mixed question of law and fact for one purpose does not govern its characterization for all purposes." <u>United States</u> v. <u>Gaudin</u>, 515 U.S. 506, 522 (1995). In <u>Gaudin</u>, the Court noted that mixed questions of law and fact have typically been resolved by juries. <u>Id.</u> at 512 (citing <u>TSC Industries, Inc.</u>, 426 U.S. at 450; <u>McLanahan</u> v. <u>Universal Ins. Co.</u>, 26 U.S. (1 Pet.) 170, 188-89, 191, 7 L.Ed. 98 (1828) (materiality of false statements in insurance applications)). Yet the Court declined to overrule its previous decision in <u>Kungys</u> v. <u>United States</u>, 485 U.S. 759 (1988), which "held that, in appellate review of a District Court (nonjury) denaturalization proceeding, the appellate court's newly asserted standard of materiality could be applied to the facts by the appellate court itself, rather than requiring remand to the District Court for that application." <u>Gaudin</u>, 515 U.S. at

-17-

in the securities fraud arena, materiality in the FCA context involves a factual determination of the weight that the decisionmaker would have given particular information. See United States v. Job Resources for the Disabled, No. 97 C 3904, 2000 WL 1222205, at *3 (N.D. Ill. Aug. 24, 2000). While a district court may determine at the summary judgment stage that undisputed evidence demonstrates that a false statement or claim is material (or immaterial) as a matter of law, that is not the posture in which this case is presented.

When Unum moved for judgment as a matter of law, it argued that the statements at issue could not be viewed as material to the SSA's decision whether to award benefits because (1) the claimants had "disclosed fully and fairly the underlying facts upon which the statement[s] [were] made"; and (2) "[t]hat decision is made by the SSA alone, after a full review of all of the available medical records." The district court heard those arguments and rejected them, finding a legally sufficient evidentiary basis on which a reasonable jury could find against Unum.[11]

We will uphold the jury's verdict unless "the facts and inferences viewed in the light most favorable to the verdict point

---

522 (citing Kungys, 485 U.S. at 772).

[11]We note that on remand the district court would be free to reconsider, in light of previously excluded evidence, whether Unum would be entitled to judgment as a matter of law on the issue of materiality.

so strongly and overwhelmingly in favor of [Unum] that a reasonable jury could not have returned the verdict.'"  Mass. Eye and Ear Infirmary, 552 F.3d at 57.

Regardless, whether we employ de novo review on the issue of materiality or a standard more deferential to the jury's verdict, we find that on the evidence before the jury, the statements at issue here were material to the SSA's payment decision.

## 3. Evidence of Materiality[12]

The case was submitted to the jury on the theory that the false statements alleged by Relator were the statements in the application for SSDI that the applicant was "unable to work" or "is disabled."[13]

Unum argues that the statements at issue cannot be material because the SSA conducts an independent review of medical and other evidence to determine the actual date that the applicant became unable to work within the meaning of the Social Security

---

[12]We note at the outset that our conclusions in this section are based only on the evidence that was actually presented to the jury.

[13]The court instructed "I want to emphasize that the plaintiff's position is that both the use of the words 'unable to work' and 'I am disabled' are the alleged false statements and false claims here, and those are both to be construed within the meaning of the Social Security Act."

-19-

Act.[14]  The date reported by the applicant, Unum argues, serves as only a starting point for this independent review, and thus cannot be "material evidence of disability."  Unum argues that the statement that an applicant is unable to work as of a particular date is a "legal conclusion . . . not a factual representation likely to influence the SSA's decision."  In effect, Unum argues that because the Agency conducts an independent review to determine whether the applicant is unable to work as defined by the Social Security Act, the applicant's own opinion that she is unable to work is not material.  We disagree.

Unum's argument misunderstands the definition of materiality.  As several of our sister circuits have held, the

---

[14]Unum cites the SSA's Program Operations Manual System ("POMS"), the publicly available operating instructions for processing Social Security claims, which differentiates between the "alleged onset date" ("AOD") of the applicant's disability and the "established onset date" ("EOD") of the disability.  The AOD is "the date the claimant alleges he or she became unable to work because of his or her medical condition, regardless of whether or not that date appears to be appropriate."  POMS DI 25501.001(E)(1) (2008), available at https://secure.ssa.gov/apps10/poms.nsf/aboutpoms (last visited Jul. 19, 2010) (emphasis added).  The EOD, by contrast, is determined by the disability adjudicator "based on the medical and other evidence in the case record."  POMS DI 25501.001(E)(3).  The AOD is "the starting point in establishing the onset of disability," and "[i]f the medical and other evidence is consistent with the AOD," the AOD will also be the EOD.  POMS DI 25501.011(A).  However, "[m]edical and other evidence is the primary consideration in determining the EOD."  POMS DI 25501.011(C).  The POMS instructs disability adjudicators that "[i]f the evidence supports a date other than the AOD, establish the most accurate onset date (either earlier or later than the AOD) that is consistent with the total evidence."  POMS DI 25501.021(C).

natural tendency test focuses on the potential effect of the false statement when it is made. See Longhi, 575 F.3d at 470; Bourseau, 531 F.3d at 1171. In other words, all that the test requires is that the false or fraudulent statement is capable of influencing the Agency's decision.

Moreover, the fact that an allegedly false statement constitutes the speaker's opinion does not disqualify it from forming the basis of FCA liability. An opinion may qualify as a false statement for purposes of the FCA where the speaker "knows facts 'which would preclude such an opinion.'" United States ex rel. Siewick v. Jamieson Science and Engineering, Inc., 214 F.3d 1372, 1378 (D.C. Cir. 2000) (quoting Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 792 (4th Cir. 1999)).[15] "Facts" for this purpose are those which the applicant could "reasonably classify as true or false" as opposed to "legal argumentation and possibility." Id.

We note that Unum is not challenging the jury's conclusion that the statements at issue were false, but merely the conclusion that they were materially false. We find, on the evidence before the jury, that an applicant's opinion regarding the

---

[15]The Harrison court quoted Prosser for the proposition that "an opinion or estimate carries with it 'an implied assertion, not only that the speaker knows no facts which would preclude such an opinion, but that he does know facts which justify it.'" Harrison, 176 F.3d at 792 (quoting W. Page Keeton, et al., Prosser & Keeton on the Law of Torts § 109, at 760 (5th ed. 1984)).

-21-

date on which he became unable to work is material, in that it has the potential to influence the Agency's determination of one's eligibility for benefits. Cf. United States v. Pythian, 529 F.3d 807, 812-13 (8th Cir. 2008) (holding in the context of a 42 U.S.C. § 408(a)(3) prosecution that applicant's statements to the SSA that she was not working and was unable to work were material in that they had "'a natural tendency to influence' the SSA in making its eligibility determination, as the ability to work is critical to the SSA's determination.").

Unum calls to our attention a portion of the Code of Federal Regulations, which states that a medical doctor's determination that an applicant is "unable to work" as defined by the Social Security Act is entitled to no "special significance". 20 C.F.R. § 404.1527(e). This is so because it is an opinion on an issue that is "reserved to the Commissioner because [it is an] administrative finding[] that [is] dispositive of a case." Id. We do not believe, however, as Unum suggests, that the above provision means that a statement by the applicant of an inability to work is immaterial to the Agency's decision. Certainly, an applicant's opinion that he is "unable to work" is not determinative of the Agency's final decision, just as a doctor's opinion that an applicant is "unable to work" is not conclusive, as the responsibility for "making the determination or decision about whether [the applicant] meet[s] the statutory definition of

-22-

disability" lies with the Commissioner. 20 C.F.R. § 404.1527(e)(1). Nonetheless, if an applicant were to fail to answer question 5(a) on the application form, where he is asked to provide the date when he became "unable to work," he would not receive benefits. "An award cannot be processed" if an applicant does not answer "all questions affecting entitlement." POMS GN 00205.001(B). Similarly, as Relator's expert Kenneth Nibali testified at trial, a response of "not applicable" or "N/A" would not be an appropriate response to question five.[16]

The trial testimony of Relator's and Unum's Social Security experts established that the agency uses "all the information" on the application form to begin to create a record in evaluating an applicant's claim. Question 5(a) is a "starting point" from which the agency starts making decisions on an applicant's disability. As Nibali explained, the response to that question is "a very critical piece of information for starting the process" because "[i]t's [the applicant's] allegation as to when [he] first became unable to work because of [his] illnesses, et cetera."

---

[16]Nibali stated "I know that the instructions, the program operation manual that is the guidance for the employees filling this out says where an answer is simply not available, that you may put that kind of response in[, see POMS DI 11005.022(C)]; but I know these instructions also very much say that this is something that needs to be filled in, and you do your very best to get the claimant's allegation about when they felt they were unable to work."

-23-

Though all three experts testified to the SSA's "open-door policy" of encouraging all comers to apply, each also testified that the SSA expects all applicants to be truthful. The Code of Federal Regulations states that those who "believe [they] <u>may be entitled</u> to benefits" should apply. 20 C.F.R. § 404.603 (emphasis added). While applicants are not required to self-assess their eligibility and there is "no expectation of complete and utter accuracy," an applicant must sign under penalty of perjury that his application is truthful to the best of his knowledge and ability. An applicant could face criminal and civil penalties if he "makes or causes to be made any false statement or representation of a material fact" in applying for SSDI. 42 U.S.C. § 408(a)(2); 42 U.S.C. § 1320a-8(a)(1).[17]

As Nibali explained, "it costs a lot of money to take in claims and process them, that's taxpayer money . . . that we all pay. So we would like to think that people have a belief that they may have a disability that meets our definition if they're going to come into our program."

Given the instructions presented to applicants on the disability report and the signature requirement on the application form, it is reasonable for the SSA to conclude that an applicant in

---

[17]The Social Security Act defines "a material fact" as "one which the Commissioner of Social Security may consider in evaluating whether an applicant is entitled to benefits." 42 U.S.C. § 1320a-8(a)(2).

good faith believes that he may be eligible for SSDI benefits when submitting an application. Specifically, when an applicant provides a date on which he became unable to work in response to question 5(a) on the application form (rather than leaving the question blank or answering "not applicable"), the SSA may reasonably conclude that, at the very least, the applicant believes himself to be "unable to work" as he understands the Social Security Act's definition of that term.

Though this belief, which may be inferred from an affirmative response to question 5(a), can be no more than the applicant's opinion since the SSA bears the responsibility of evaluating the applicant's eligibility, as we have stated, an opinion may be characterized as a false statement for purposes of the FCA if its maker knows facts which would preclude it. Siewick, 214 F.3d at 1378. As we discuss further below, there was substantial evidence presented at trial that Unum knew, or at the very least should have known, facts about George and Jennine's medical condition and work capacity that would preclude an opinion that either was "unable to work."

Moreover, the fact that the Agency conducts an independent evaluation of each applicant's eligibility does not render the applicant's (or, in this case, Unum's) opinion immaterial. As the Sixth Circuit opined in the Medicare context "[a] party cannot file a knowingly false claim on the assumption

that the fiscal intermediary will correctly calculate the value in the review process. Such a result would shift the burden of cost calculation from the provider to the fiscal intermediary and encourage the filing of false claims, which is directly at odds with the stated goal of the FCA." A+ Homecare, Inc., 400 F.3d at 447 (citation omitted). Though an applicant for SSDI bears a lesser burden of presenting accurate information than does a provider under Medicare regulations, an SSDI applicant at least bears the burden of being truthful and forthcoming in his responses to the Agency. If he himself knows facts which would preclude a belief that he is unable to work as defined by the Social Security Act, and yet indicates on his application that he is unable to work, then his false statement causes his application to move forward through the Agency's evaluation process when it otherwise would not have. Because the statement is capable of influencing the Agency's decision to consider and ultimately pay the claim, it is thus material under the FCA.

## B. Scienter

### 1. Standard of Review

Again, we review de novo the denial of a motion for judgment as a matter of law. Burke, 572 F.3d at 57. We will uphold the jury's verdict on scienter "unless the facts and inferences viewed in the light most favorable to the verdict point

so strongly and overwhelmingly in favor of the movant that a reasonable jury could not have returned the verdict."  Id.

## 2. FCA's Definition of Scienter

To be found liable under the FCA, an individual must act "knowingly" in submitting a false claim.  31 U.S.C. § 3729(a)(1)-(2) (2008).[18]  The statute defines "knowing" and "knowingly" as having "actual knowledge" of information or acting in "deliberate ignorance" or "reckless disregard" of the truth or falsity of the information.  31 U.S.C. § 3729(b)(1)-(3) (2008).[19]

Unum argues that in order to establish the requisite scienter, the relator must show not only that Unum acted knowing that the statements at issue were false, but knowing that they were materially false.  In support of its argument, Unum quotes Allison Engine, which, in its introductory section states that "a plaintiff asserting a section 3729(a)(2) claim must prove that the defendant intended that the false record or statement be material to the Government's decision to pay or approve the false claim." Id., 128 S.Ct. at 2126 (emphasis added).  But the Allison Engine court expressly distinguished its holding as to intent from section 3729's scienter requirement, explaining that the intent requirement that the Court discerned in section 3729(a)(2) did not derive from

---

[18]The FERA amendments did not alter the statute's scienter requirement.  See 31 U.S.C. § 3729(a)(1)(A)-(B).

[19]The amended version of the statute defines "knowingly" in precisely the same manner.  31 U.S.C. § 3729(b)(1)(A)(i)-(iii).

the term "knowingly," but rather from the infinitive phrase "to get" in "knowingly makes, uses, or causes to be made or used, a false record or statement <u>to get</u> a false or fraudulent claim paid or approved by the Government." <u>Id.</u> at 2130 n.2. The Court further distinguished its holding from the FCA's definition of "knowingly," explaining that its holding "refers to a defendant's purpose in making or using a false record or statement" while section 3729(b) "refers to specific intent with regard to the truth or falsity of 'information.'" <u>Id.</u>

In other words, it appears that while affirming the existence of a materiality requirement for section 3729(a)(2), <u>Allison Engine</u> did not alter the FCA's scienter requirement. Unum's claim that the FCA requires that a defendant have knowledge that a claim was materially false is a misreading of the statute and of <u>Allison Engine</u>.

## 3. Evidence of Scienter

Unum argues that it cannot be found to have the requisite scienter as a matter of law because its conduct was entirely consistent with the SSA's established practices. It argues that no SSA regulations or policy require that private disability insurers "prescreen" an application, and therefore it could not have known that it had a duty to screen applicants for some minimal likelihood

of success.[20]  Unum presented these arguments to the district court as well as the jury, and they were rejected.  We find that the jury was not unreasonable in this conclusion.

Unum argues that it acted reasonably in viewing the regulations and practice of the SSA as allowing any individual who meets the non-disability requirements of Title II to apply.  In support, Unum cites the POMS, which explicitly states that "[e]very individual who meets the necessary nondisability requirements of title II . . . is entitled to a substantive determination about whether he/ she is under a disability."  POMS DI 22501.003.  Unum notes that the POMS also instructs SSA employees that when it appears during a preclaim interview that a claimant does not meet the eligibility requirements for SSDI, the employee should inform the claimant of that fact but still advise him of the right to file an application "in spite of apparent ineligibility."  POMS DI 11005.005.B.2.  Unum further cites the testimony of SSA's Rule

---

[20]Unum proffers that the SSA knowingly allows state agencies and the federal FERS program to routinely require individuals to apply for SSDI without making any pre-determination that those individuals are so entitled.  Unum argues that the SSA's "well-known and published acceptance" of this practice by state agencies and the federal FERS program lends support to its argument that it had no reason to believe that it was required to prescreen insureds before requiring them to apply for SSDI.  As Unum explains it, "[i]t hardly would be unreasonable to conclude that, if those individuals were not submitting a false claim simply by supplying the dates they were unable to work when the SSA would conclude otherwise, neither would it be a false claim when one of Unum's insureds does the same thing."  We discuss the issue of excluded "FERS evidence" in more detail in Section III.C.

30(b)(6) designee, presented at trial, that "there's currently no published policy out there that requires . . . private disability insurers to quote/unquote 'prescreen' an application before a claimant comes and files."

In effect, Unum argues that because the SSA's own regulations did not appear to disapprove of Unum's practice of requiring insureds to apply for SSDI after they had been disabled for six months, Unum could not have "known" that it was causing false claims to be submitted because it was reasonable to think that the Agency welcomed such claims. In support, Unum cites decisions from several of our sister circuits noting, "[t]o take advantage of a disputed legal question . . . is to be neither deliberately ignorant nor recklessly disregardful." United States ex rel. Hagood v. Sonoma Cnty. Water Agency, 929 F.2d 1416, 1421 (9th Cir. 1991); see also United States v. Southland Mgmt. Corp., 326 F.3d 669, 682 n.7 (5th Cir. 2003) (Jones, J., concurring); United States ex rel. Hochman v. Nackman, 145 F.3d 1069, 1074 (9th Cir. 1998).

But this is not a case of a "disputed legal question." Though the SSA has an "open-door policy" encouraging all comers to apply, SSA regulations state that those who "believe [they] may be entitled to benefits" should file an application, 20 C.F.R. § 404.603, implying, as discussed above, that those who do not in good faith believe that they may be entitled, should not apply.

Though the SSA has not promulgated any guidance as to whether a private disability insurer has any obligation to prescreen claimants for SSDI eligibility before requiring them to apply, it appears clear from the evidence in the record that the Agency does not invite applications from those who have no basis for a good faith belief that they are eligible for SSDI benefits. The jury heard evidence that justified a reasonable conclusion that George and Jennine's applications fell into that category. Not only did Unum have a clear understanding of the difference between its own "own occupation" standard and the SSA's more rigorous "any occupation" standard, but it also had knowledge of Jennine and George's capacity for work as reflected by the information in their claims files. Given that evidence, it was not unreasonable for the jury to conclude that Unum at least had "reckless disregard" for the falsity of George and Jennine's statements that they were "unable to work" within the meaning of the Social Security Act.

Other cases which Unum cites in support of its position are inapposite. This is not a case in which Unum "did merely what the [SSA] bid it do." Hagood, 929 F.2d at 1421; see also United States ex rel. Durcholz v. FKW Inc., 189 F.3d 542, 545 (7th Cir. 1999) ("We decline to hold FKW liable for defrauding the government by following the government's explicit directions."); United States ex rel. Becker v. Westinghouse Savannah River Co., 305 F.3d 284, 288-89 (4th Cir. 2002) (affirming defendant's motion for summary

judgment, noting that agency had "instructed" defendant to make representations which relator alleged were false).  SSA did not direct Unum to require its six-months'-disabled insureds to submit claims for SSDI.

Nor can Unum claim that the SSA had prior knowledge that the claims Unum caused to be submitted were false.  See Durcholz, 189 F.3d at 545 ("If the government knows and approves of the particulars of a claim for payment before that claim is presented, the presenter cannot be said to have knowingly presented a fraudulent or false claim.") (emphasis added); Southland Mgmt. Corp., 326 F.3d at 682 (Jones, J., concurring) ("Where the government and a contractor have been working together, albeit outside the written provisions of the contract, to reach a common solution to a problem, no claim arises."); United States ex rel. K&R Ltd. P'ship v. Mass. Housing Finance Agency, 530 F.3d 980, 984 (D.C. Cir. 2008); Wang v. FMC Corp., 975 F.2d 1412, 1421 (9th Cir. 1992).  The jury heard testimony that the SSA was unaware of the specifics of Unum's practices.  Unum attempts to bolster its "government knowledge" argument by noting that it knew that the SSA would engage in an independent gathering and assessment of the facts underlying each claim, but that is not evidence that the SSA knew of any deficiencies in the claims at issue before they were filed.

## C. FERS Evidence

Next, Unum argues that the district court excluded evidence which precluded Unum from mounting its "principal scienter argument." Unum sought to show that the federal government under the Federal Employee Retirement System ("FERS") and state governments under comparable programs regularly require applicants to apply for SSDI as a condition of applying for other forms of federal and state benefits (generally, "FERS evidence"). Unum contends that this evidence was critical to its defense that it did not knowingly cause the submission of false claims because it would have shown that the federal and state programs did not engage in any prescreening before requiring employees to file for SSDI, that the SSA was aware of that practice and affirmatively took no position as to whether it was inappropriate or not, and that the SSA's "well-known and published acceptance" of that practice gave Unum good cause to think that its own conduct was lawful.

We review the district court's ruling excluding the proffered evidence for abuse of discretion. United States v. Rodriguez-Velez, 597 F.3d 32, 40 (1st Cir. 2010). "In deference to a district court's familiarity with the details of the case and its greater experience in evidentiary matters, [we] afford broad discretion to a district court's evidentiary rulings." Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 384 (2008).

We find that the district court abused that discretion in this case. The district court found, without elaboration, that it had "an inadequate basis for comparing FERS to Unum." Because the court did not explain its ruling, we are left to guess at its reasoning. What is clear, however, is that the court appeared to disregard a highly relevant "basis for comparing" FERS to Unum: the SSA's practices in evaluating claims for SSDI benefits which each of those entities caused to be submitted.

Evidence that FERS and comparable state programs require applicants to file for and pursue SSDI claims as a condition of applying for other forms of federal and state benefits is not necessarily relevant in and of itself to Unum's defense. What is relevant is the SSA's knowledge that FERS and state programs imposed such requirements on their applicants and the SSA's inability (or refusal) to differentiate between FERS applicants and Unum applicants. By excluding this evidence, the court prevented the jury from considering evidence that was highly relevant to the issue of materiality.[21]

_____

[21]As detailed above, Unum focuses its argument on the relevance of the excluded evidence to the issue of Unum's scienter; we do not find that argument to be compelling and thus do not address it here.

However, Unum's argument also implicates the element of materiality. As discussed in Section III.B.2, Unum argues that it could not have had scienter that it was causing material false statements to be made. In effect, Unum argues that it could not have known the statements were material since it knew that the SSA was aware that even the government (FERS) caused such statements to be made routinely through a claims process in which FERS claims

The excluded evidence supports the conclusion that the statement that a claimant is "unable to work" is not capable of influencing the agency's decision to approve the claim. Though it would appear from the face of the SSDI application form and disability report and the evidence presented at trial that such a statement is material to the SSA's decision, as discussed in Section III.A. supra, excluded evidence of the Agency's practices appears to belie that conclusion.

The excluded evidence would have demonstrated that the SSA was aware that under FERS, every federal employee seeking FERS disability retirement benefits must file an application for SSDI benefits as well. See 5 C.F.R. §§ 844.201(b)(1), 844.201(b)(2), 844.203(a).[22] It would have also demonstrated that the SSA knew

_____

were not separately identifiable. Unum seeks to base this argument on evidence indicating that the SSA could not have treated disability statements as material, i.e., evidence helping to show that they were not material. Thus, Unum is making a materiality argument as part of a scienter argument, and it is on that basis that we consider the relevance of the FERS evidence.

We note, as well, that Unum argued directly to the district court that the FERS evidence was relevant to the issue of materiality, and we explored this point thoroughly with Relator's counsel at oral argument.

[22]We note that in order to receive a disability annuity under FERS, the individual's "disabling medical condition" must be expected to continue for at least one year from the date the application for disability retirement is filed. 5 C.F.R. § 844.103(a)(3). Though that provision suggests that FERS requirements for eligibility are more closely aligned with SSDI's eligibility requirements than Unum's, it does not change our conclusion. An individual can receive FERS benefits without meeting a definition of disability as stringent as SSDI's "any occupation" standard, see 5 U.S.C. §§ 8451(a)(1)(B), 8451(a)(2)(A),

-35-

that not only the federal government, but also the "states keep . . . dumping people on SSA that they know may not be eligible." The record reflects that the SSA cannot differentiate between a FERS applicant and any other applicant. It follows that the Agency must necessarily assume that on any given application, the response to question 5(a) could be false in the same way that George and Jennine's assertions of disability were determined to be false -- that the applicant is applying only because he was required to do so by FERS and therefore does not necessarily have a good faith belief that he may be "unable to work" under the statute. In light of the FERS evidence, a jury could reasonably conclude that the SSA has no reason to believe that <u>any</u> applicant is implying, through an affirmative answer to that question, that he may be eligible for benefits.

Thus, the excluded evidence tends to support the conclusion that an affirmative answer to question 5(a) carries no implied opinion as to potential eligibility, and that therefore, it could not have been capable of influencing the SSA's decision to initially process or eventually pay the claims at issue; i.e., it could not have been material.

By excluding from the jury evidence of the SSA's knowledge, and apparent acquiescence in, the requirement by FERS

---

5 C.F.R. §§ 844.103(a)-(b), so it cannot be presumed that an applicant meeting FERS's eligibility requirements will also be eligible for SSDI.

and comparable state programs that <u>all</u> claimants apply for SSDI without regard to potential eligibility, the district court prevented the jury from considering evidence that was highly relevant to the essential element of materiality. The probative value of the evidence outweighs any potential it may have had to mislead the jury, Fed. R. Evid. 403, especially if it were appropriately cabined to bear on the issue of materiality rather than on Unum's scienter.

## IV. Conclusion

For these reasons, the exclusion of the FERS evidence was not harmless, and while we affirm the district court's denial of Unum's motion for judgment as a matter of law, we must vacate the jury's verdict and remand for a new trial.[23]

**Judgment vacated. Remanded for further proceedings consistent with this opinion. Costs in favor of Unum Group.**

---

[23]In light of this outcome, we need not address Unum's contentions that the district court erred in instructing the jury on scienter and in refusing to give several additional instructions that Unum requested.