UNITED STATES of America, ex rel. Jeffrey J. BIERMAN

v.

ORTHOFIX INTERNATIONAL, N.V., et al.

Civil Action No. 05–10557–RWZ.

United States District Court, D. Massachusetts.

Signed July 1, 2015.

---

Neil V. Getnick, Erika Ithurburn, Lesley A. Skillen, Margaret J. Finerty, Richard J. Dircks, Stuart Altschuler, Getnick & Getnick, LLP, New York, NY, Scott J. Tucker, Tucker, Saltzman & Dyer, LLP, Patrick M. Callahan, United States Attorney's Office MA, Boston, MA, Courtney Baron, David J. Chizewer, Emily D. Gilman, Matthew K. Organ, Goldberg Kohn Ltd., Chicago, IL, G. Robert Blakey, Notre Dame Law School, Notre Dame, IN, for United States of America, ex rel. Jeffrey J. Bierman.

Don P. Martin, Michael S. Catlett, Quarles & Brady LLP, Phoenix, AZ, Kelli A. Edson, Quarles & Brady LLP, Tampa, FL, Allison J. Caplis, Hogan Lovells U.S. LLP, Andrea W. Trento, Stephen J. Immelt, Hogan & Hartson, L.L.P., Baltimore, MD, Douglas A. Robertson, Martin, Magnuson, McCarthy and Kenney, Diana K. Lloyd, Eric J. Teasdale, Genevieve Aguilar Reardon, James W. Evans, Choate, Hall & Stewart, Boston, MA, Michele W. Sartori, Mitchell J. Lazris, Robert L. Toll, Hogan & Hartson, L.L.P., Kathleen H. McGuan, Andrew C. Bernasconi, Reed Smith LLP, Washington, DC, George M. Linge, Reed Smith LLP, Pittsburgh, PA, Joseph J. Mahady, Thomas H. Suddath, Jr., Reed Smith LLP, Philadelphia, PA, for Orthofix International, N.V., et al.

### ORDER

RYA W. ZOBEL, District Judge.

Plaintiff-relator Jeffrey J. Bierman brought this *qui tam* action on behalf of the United States and several state and municipal entities alleging that numerous defendants, including EBI and DJO,[1] violated the federal False Claims Act, 31 U.S.C. § 3729; the federal Anti–Kickback Statute, 42 U.S.C. § 1320a–7b(b); and various state and local fraud laws that closely mirror the False Claims Act.[2] The allega-

---

1. "EBI" refers to EBI, LLC (f/k/a EBI, L.P.), EBI Holdings, LLC (f/k/a EBI Holdings, Inc.), EBI Medical Systems, LLC (f/k/a EBI Medical Systems, Inc.), Biolectron, Inc., and Biomet Inc. "DJO" refers to DJO Incorporated and ReAble Therapeutics, Inc.

2. The relator asserts claims under the following: the California False Claims Act, Cal. Gov't Code §§ 12650–12655; the Delaware False Claims and Reporting Act, 6 Del. C.

§§ 1201 et seq.; the District of Columbia Procurement Reform Amendment Act, D.C.Code Ann. §§ 2–308.13–21; the Florida False Claims Act, Fla. Stat. Ann. §§ 68.081–092; the Georgia State False Medicaid Claims Act, Ga.Code Ann. §§ 49–4–168 et seq.; the Hawaii False Claims Act, Haw.Rev.Stat. §§ 661–21–29; the Illinois Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. §§ 175/1–8; the Indiana False Claims and

tions all relate to reimbursement claims that the defendants submitted to Medicare for purchases of their bone growth stimulator devices. The federal government elected not to intervene, Docket # 26, and the relator is now pursuing the case directly.

EBI and DJO, the only active defendants left in the case, move for partial summary judgment on two of the relator's False Claims Act liability theories: that every claim for purchase of a bone growth stimulator device they submitted to Medicare is actionable under the False Claims Act because, first, they did not comply with an obligation called "Supplier Standard No. 5 and, second, they did not offer to rent, rather than sell, their devices." [3] As to the first theory, EBI and DJO contend that Supplier Standard No, 5 does not impose a condition of payment, wherefore certification of compliance with it (or lack

thereof) is irrelevant to Medicare's decision to pay an individual claim. As to the second theory, EBI and DJO contend that they have no obligation to rent their devices, so failure to do so cannot result in FCA liability. The motions are allowed.

## I. Background

The parties and allegations are described at length in the court's 2010 ruling on defendants' motions to dismiss; I will, therefore, recite them only briefly here. *See U.S. ex rel. Bierman v. Orthofix Int'l, N.V.,* 748 F.Supp.2d 123, 125–27 (D.Mass. 2010).

Each of the defendants sells bone growth stimulator devices, which are covered by Medicare. Medicare classifies the stimulators as "inexpensive or other routinely purchased" durable medical equipment,[4] and it pays for them on either a

---

Whistleblower Protection Act, IC 5–115.5 et seq.; the Louisiana Medical Assistance Programs Integrity Law, La.Rev.Stat. 46:437.1–14; the Massachusetts False Claims Act, Mass. Gen. L. ch. 12, §§ 5B et seq.; the Michigan Medicaid False Claims Act, MCL §§ 400.601 et seq.; the Nevada False Claims Act, Nev.Rev.Stat. §§ 357.010 et seq.; the New Hampshire Medicaid Fraud and False Claims Act, RSA §§ 167.58 et seq.; the New Mexico Medicaid False Claims Act, N.M. Stat. Ann. §§ 27–12–1 et seq.; the New York False Claims Act, N.Y. State Fin. Law §§ 187–194; the Tennessee Medicaid False Claims Act, Tenn.Code Ann. §§ 71–5–182 et seq.; the Tennessee False Claims Act, Tenn.Code Ann. §§ 4–18–101 et seq.; the Texas Medicaid Fraud Prevention Law, Tex. Hum. Res.Code Ann. §§ 36.001 et seq.; the Virginia Fraud Against Taxpayers Act, Va.Code Ann. §§ 8.01–216.3 et seq.; and the Chicago False Claims Act, Chicago Municipal Code ch. 1–21 et seq.

3. The only other remaining defendant in this case, Smith & Nephew Inc., likewise moves for partial summary judgment on these theories. *See* Docket # 266. But, because this case is stayed with respect to Smith & Nephew pending review of a settlement, *see* Docket # 314, the court will not address that motion.

Because the defendants incorporate each others' papers into their own motions by reference, I have reviewed and considered Smith & Nephew's arguments to the extent that they are relevant to EBI's or DJO's motions.

4. "Durable medical equipment" is frequently abbreviated in the regulations and briefs as "DME" or referred to with the broader term "DMEPOS," which stands for "durable medical equipment, prosthetics, orthotics and supplies."

The parties' submissions groan from the weight of acronyms like these, so much so that one of the moving parties took the unusual step of including a "Glossary of Terms and Abbreviations" with its summary judgment memorandum. *See* Docket # 270–13. That was a much appreciated tool to decipher the briefs, which adopted the terminology of the regulations at the expense of clarity. But the briefs did not need to do that. The court encourages the parties to limit their use of acronyms in future filings. *Cf. Del. Riverkeeper Network v. F.E.R.C.,* 753 F.3d 1304, 1321 (D.C.Cir.2014) (Silberman, J., concurring) ("The use of obscure acronyms, sometimes those made up for a particular case, is an aggravating development of the last twenty

monthly rental or purchase basis. The fee schedule for reimbursements varies from state to state, but, generally speaking, the purchase price for the stimulators is about ten times more than their monthly rental price.

The Centers for Medicare and Medicaid Services ("CMS"), which is the successor of the former Health Care Financing Administration, is the federal agency that administers the Medicare program. Specifically, CMS oversees reimbursements for bone growth stimulator devices. CMS also promulgates and oversees the regulations that govern these reimbursements. CMS's regulations require a supplier of medical equipment that seeks to receive Medicare billing privileges to submit a Medicare Enrollment Application, or Form CMS–855S, and renew it every three years. As discussed in more detail below, the application requires the supplier to certify that it will abide by applicable Medicare laws, regulations, and program instructions. One such regulation that is central to the present motions is a set of Supplier Standards, which impose certain obligations on durable medical equipment suppliers. See 42 C.F.R. § 424.57(c). At this stage of the case, defendants do not challenge that they were out of compliance with one of the Supplier Standards, referred to as Supplier Standard No. 5, for at least part of the relevant time period.

After a supplier receives billing privileges, it may submit reimbursement claims to CMS using a Form CMS–1500 accompanied by a Certificate of Medical Necessity. For each reimbursement, the CMS–1500 requires the supplier to indicate whether the bill is for a rental item, a purchase of new equipment, or a purchase of used equipment. The supplier must also certify on the CMS–1500 that "the services shown on the form were medically indicated and necessary to the health of the patient." Likewise, the accompanying Certificate of Medical Necessity must include certain information about the patient's needs and be signed by the ordering health care professional.[5] Each defendant submitted many CMS–1500s and Certificates of Medical Necessity to CMS seeking reimbursements for its bone growth stimulator devices.

The relator filed his original complaint on March 23, 2005, and it was unsealed on November 28, 2008. The currently operative complaint, or second amended complaint ("SAC"), followed on June 11, 2010. Docket #121. The court denied defendants' motions to dismiss the SAC's claims on December 8, 2010, concluding that the allegations, if taken as true, were sufficient to state a claim for violations of the False Claims Act. Docket #165. The court approved a stipulation of dismissal of claims against one of the originally named defendants, Orthofix,[6] on April 12, 2013 (Docket #218), and the case against defendant Smith & Nephew Inc. is stayed pending government approval of a settlement (Docket #314). Fact discovery is now substantially complete, and expert discovery is underway.

## II. Legal Standard

Summary judgment will be granted if there is no genuine dispute as to any material fact and the movant is entitled to

years. Even with a glossary, a judge finds himself or herself constantly looking back to recall what an acronym means.").

5. The specifics of the Certificate of Medical Necessity requirement, while allegedly relevant to some of the relator's other liability theories, are not relevant to the present motions.

6. "Orthofix" refers to Orthofix International, N.V. and Orthofix, Inc.

judgment as a matter of law. Fed. R.Civ.P. 56(a). The court must view the record in the light most favorable to the nonmovant and draw all justifiable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party initially bears the burden of demonstrating the absence of a genuine issue of material fact. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 n. 10, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). If the moving party has carried its burden, to defeat the motion, the nonmovant must then "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 587, 106 S.Ct. 1348 (quoting Fed. R.Civ.P. 56(e) (emphasis omitted)). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris,* 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007).

## III. Discussion

 The False Claims Act is an "expansive" statute, intended "to reach all types of fraud, without qualification, that might result in financial loss to the Government." *United States ex rel. Escobar v. Universal Health Servs., Inc.,* 780 F.3d 504 (1st Cir.2015); *see also Cook Cnty., Ill. v. United States ex rel. Chandler,* 538 U.S. 119, 129, 123 S.Ct, 1239, 155 L.Ed.2d 247 (2003) (internal quotation marks omitted). It proscribes "knowingly present[ing], or caus[ing] to be presented, ... a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A).[7] To be actionable, a false or fraudulent statement must also be material to the government's decision to pay a claim. *Loughren,* 613 F.3d at 307.

 False statements come in the full spectrum of shades of grey, and the False Claims Act provides little help to courts attempting to separate actionable ones from permissible ones. To provide handholds, some circuits have divided the various types of false submissions into categories and announced bright-line rules. One such categorization divides statements that are factually false from those that are legally false. *See, e.g., United States ex rel. Conner v. Salina Reg'l Health Ctr.,*

---

7. The relator asserts four causes of action under the False Claims Act: violations of 31 U.S.C. § 3729(a)(1) (Count I), § 3729(a)(2) (Count II), § 3729(a)(1)(A) (Count III), and § 3729(a)(1)(B) (Count IV). On their face, Counts III and IV appear to be subsets of Count I. Count II also refers to a section of the statute on "[r]educed damages" that does not appear to embody a cause of action. The confusion likely comes from the age of this case coupled with the Fraud Enforcement Recovery Act ("FERA"), Pub.L. No. 11–21, 123 Stat. 1617 (2009), which Congress passed in 2009—*i.e.,* between the filing of the First Amended Complaint, which asserted only the first two counts, and the Second Amended

Complaint, which asserts all four counts. FERA redesignated 31 U.S.C. § 3729(a)(1) as 31 U.S.C. § 3729(a)(1)(A) and 31 U.S.C. § 3729(a)(2) as 31 U.S.C. § 3729(a)(1)(B). New section 3729(a)(1)(B) was made retroactive to "all claims" under the False Claims Act pending on or after June 7, 2008, but new section 3729(a)(1)(A) was not. *See, e.g., United States ex rel. Loughren v. Unum Grp.,* 613 F.3d 300, 306 n. 7 (1st Cir.2010). I therefore construe Counts II and IV to be identical, stating claims under new 31 U.S.C. § 3729(a)(1)(B), and Counts I and III to be separate and relate to pre- and post-FERA conduct, respectively.

*Inc.,* 543 F.3d 1211, 1217 (10th Cir.2008); *Mikes v. Straus,* 274 F.3d 687, 696–97 (2d Cir.2001). Legally false statements include, for example, false certifications of compliance with the law. Another categorization subdivides statements in the latter group into those based on a theory of "express" certification of compliance with conditions of payment from those based on a theory of "implied" certification. *See United States ex rel. Wilkins v. United Health Grp., Inc.,* 659 F.3d 295, 305–06 (3d Cir.2011) (collecting cases). An express certification is one submitted with a claim, while an implied certification is a claim that itself lacks a certification but follows an earlier, more general certification. This circuit has charted a different course. It has eschewed bright-line rules because they "create artificial barriers that obscure and distort [the False Claims Act's] requirements." *United States ex rel. Hutcheson v. Blackstone Med., Inc.,* 647 F.3d 377, 385 (1st Cir.2011); *see also Escobar,* 780 F.3d at 512. Instead, it takes "a broad view of what may constitute a false or fraudulent statement to avoid 'foreclos[ing] [False Claims Act] liability in situations that Congress intended to fall within the Act's scope,'" *United States ex rel. Jones v. Brigham & Women's Hosp.,* 678 F.3d 72, 85 (1st Cir.2012) (quoting *Hutcheson,* 647 F.3d at 387), "ask[ing] simply whether the defendant, in submitting a claim for reimbursement, knowingly misrepresented compliance with a material precondition of payment." *Escobar,* 780 F.3d at 512; *see also New York v. Amgen Inc.,* 652 F.3d 103, 110 (1st Cir.2011).

■ The pending motions question whether the alleged misrepresentations were about a precondition of payment and whether they were material.[8] I will therefore assume, for purposes of these motions, that the defendants submitted claims for reimbursement, that those claims included misrepresentations about their compliance with Medicare rules, and that the defendants knew of the misrepresentations when they submitted their claims.

First, whether a precondition is one of payment has significant implications for False Claims Act liability. Many courts, including this circuit, have recognized a distinction between requirements imposed on providers as preconditions to reimbursement via a government program ("conditions of payment") and those imposed as preconditions to participation in the program in the first instance ("conditions of participation"). Some courts have categorically held that noncompliance with the latter cannot establish the falsity of a claim. *See, e.g., United States ex rel. Hobbs v. MedQuest Assocs., Inc.,* 711 F.3d 707, 714 (6th Cir.2013) ("The success of a false certification claim depends on whether it is based on 'conditions of participation' in the Medicare program (which do not support a false claim) or on 'conditions of payment' from Medicare funds (which do support FCA claims)."); *Mikes v. Straus,* 274 F.3d 687, 697 (2d Cir.2001) ("[A] claim under the Act is legally false only where a party certifies compliance with a statute or regulation as a condition to governmental payment."). The First Circuit has not yet had the opportunity to squarely address this question, *see Escobar,* 780 F.3d at 513, but has noted that "whether a given requirement constitutes

---

8. There is some dispute among the circuits as to whether materiality is part of the precondition of payment element or a separate element. The First Circuit has noted this ambiguity but declined to take a position on it. I will address the elements separately, ever mindful that the ultimate rule of law is that "only false or fraudulent claims that are materially false or fraudulent can give rise to liability under the [False Claims Act]." *Hutcheson,* 647 F.3d at 388 n. 12.

a precondition to payment is a 'fact-intensive and context-specific inquiry,' ... involving a close reading of the foundational documents, or statutes and regulations, at issue." *Escobar,* 780 F.3d at 512–13 (quoting *Amgen,* 652 F.3d at 111).

■ As to the materiality element, "[False Claims Act] liability [is] circumscribed by 'strict enforcement of the Act's materiality ... requirement[ ].' " *U.S. ex rel. Jones v. Brigham & Women's Hosp.,* 678 F.3d 72, 86 (1st Cir.2012) (quotation omitted); *see also U.S. ex rel. Loughren v. Unum Grp.,* 613 F.3d 300, 307 (1st Cir. 2010) ("We have long held that the FCA is subject to a judicially-imposed requirement that the allegedly false claim or statement be material."). "[A] false statement is material if it has 'a natural tendency to influence, or is capable of influencing, the decision of the decisionmaking body to which it was addressed.' " *Loughren,* 613 F.3d at 307 (internal quotation marks omitted); *see also* 31 U.S.C. § 3729(b)(4) (defining "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property" after 2009 amendments to False Claims Act). "[M]ateriality [does not] turn[.] on how the government *actually* reacts to a given violation." *United States v. President & Fellows of Harvard Coll.,* 323 F.Supp.2d 151, 183 (D.Mass.2004) (emphasis added), or on whether "a program officer .... subjectively consider[s] a statement to be material." *U.S. ex rel. Feldman v. van Gorp,* 697 F.3d 78, 95 (2d Cir.2012). Rather, materiality is evaluated from an "objective standpoint .... based on the agency's own rules and regulations." *Id.*

### A. Supplier Standard No. 5

■ According to the relator, defendants violated the False Claims Act by falsely certifying their compliance with Supplier Standard No. 5 when they submitted reimbursement claims to the government. These certifications were found in two of the documents that the defendants submitted to Medicare: the CMS–1500 forms, which sought reimbursement for specific purchases, and the CMS–855S forms, which were applications to enroll in the Medicare reimbursement program.

The first, the CMS–1500, makes no reference to compliance with the Supplier Standards. Although it does require the supplier to certify that the "services shown on the form [*i.e.,* the purchased device] were medically indicated and necessary to the health of the patient," SAC ¶ 66, it does not require any sort of certification about compliance with Medicare provider regulations. This means that defendants did not expressly certify compliance with the Supplier Standards at the time that they submitted their reimbursement claims.

In the second form, the CMS–855S, defendants certified that they "agree[d] to abide by ... all applicable Medicare laws, regulations and program instructions that apply to [them]" and that they "underst[ood] that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions ... and on the supplier's compliance with all applicable conditions of participation in Medicare." [9] Docket # 322–27 at 24. The CMS–855S form expressly references the section of the regulations that contain the Supplier Standards, and it includes an "abbreviated

9. The record does not contain all of the certifications that defendants allegedly submitted, but I will assume, for the purposes of this motion, that each defendant signed one. *See* SAC ¶ 118.

summary of the [supplier] standards," including Supplier Standard No. 5. Docket # 322–37 at 2.

The relator's theory is that the defendants' CMS–855S certifications created on-going obligations to comply with Medicare regulations, so defendants "recertified" compliance with Medicare regulations each time they submitted a reimbursement claim (*i.e.,* a CMS–1500). It is, therefore, an implied certification theory.[10] *See, e.g., Hutcheson,* 647 F.3d at 383 ("Under the implied certification theory, a claim is false when the claimant makes no express certification of 'compliance with a statute or regulation, but by submitting a claim for payment, implies that it has complied with any preconditions to payment' contained in statutes or regulations."). For this theory to succeed, defendants' CMS–1500 submissions, done after submitting CMS–855S certifications, must have been misrepresentations of compliance with a condition of payment. As explained below, they were not because compliance with Supplier Standard No. 5 is not a condition of payment and is not material to the government's payment decision.

### 1. Precondition of Payment

The structure of the Supplier Standards regulation weighs heavily against treating compliance with the specific Supplier Standards as preconditions of payment. Nonetheless, under this circuit's holistic standard for evaluating whether a condition is one of payment or participation, that is not dispositive of the relator's claim. As this court recognized at the motion to dismiss stage, the determination of whether the condition is one of participation or one of payment is fact-dependent. But, with the benefit of the summary judgment record now before me, the undisputed facts clearly support the condition of participation interpretation suggested by the plain text of the regulations.

### a. Structure of the Regulations and Forms

I begin with the Supplier Standards regulation itself. The Standards are found in 42 C.F.R. § 424.57, which is titled "[s]pecial payment rules for items furnished by DMEPOS suppliers *and* issuance of DMEPOS supplier billing privileges." *Id.* (emphasis added). The title alone suggests that the regulation is multi-part, containing sections that address both rules for the payment of claims and applications for billing privileges.

Section 424.57(b), which follows a standard definition section in 424.57(a), speaks to the first topic in the regulation's title (i.e., "[s]pecial payment rules for items furnished by DMEPOS suppliers"). It sets forth a "[g]eneral rule" that requires suppliers to meet several "conditions" "in order *to be eligible to receive payment* for a Medicare-covered item." *Id.* § 424.57(b) (emphasis added). These include "submitt[ing] a completed application to CMS to furnish Medicare-covered items including required enrollment forms," having a valid CMS-issued supplier number at the time the item is furnished, and providing CMS all information and documentation required to process the claim. *Id.* § 424.57(b)(1)-(3), (5). Because these requirements affect both whether a supplier will be reimbursed for a claim and whether the supplier can participate in Medicare more generally, they are both conditions of participation and conditions of payment. Yet, these conditions in subsection (b) are the only provisions of the regulation that

---

**10.** I again note that courts of the First Circuit do not deem these labels to be dispositive of the False Claims Act liability issue. I include them only to situate this case in the broader universe of False Claims Act cases.

are addressed to matters of payment,[11] and they say nothing about compliance with the Supplier Standards.

Section 424.57(c) addresses the regulation's second function, *i.e.*, "DMEPOS supplier *billing privileges.*" It lists thirty "[a]pplication certification standards." These are the Supplier Standards, which "[t]he supplier must meet and must certify in its application for billing privileges"—the application described in § 424.57(b)(1)—"that it meets and will continue to meet." 42 C.F.R. § 424.57(c). It includes Supplier Standard No. 5, which is found at 42 C.F.R. § 424.57(c)(5) and requires a supplier of durable medical equipment to

> [a]dvise[ ] beneficiaries that they may either rent or purchase inexpensive or routinely purchased durable medical equipment, and of the purchase option for capped rental durable medical equipment, as defined in § 414.220(a) of this subchapter. (The supplier must provide, upon request, documentation that it has provided beneficiaries with this information, in the form of copies of letters, logs, or signed notices.)

Section 424.57(c) makes no reference to payment, but rather discusses only the contents of the application for billing privileges. To be sure, the requirement to submit a completed supplier application, which must include that certification in subsection (c) about compliance with the Supplier Standards, is a condition of payment in Medicare. On-going compliance with those Standards, however, is not. Once a supplier submits a complete application, it has satisfied the conditions of payment in subsection (b), and it will continue to be in compliance with those conditions unless and until its billing privileges are revoked.

Revocation of billing privileges may only occur via section 424.57(e), which addresses what may happen when a supplier fails to comply with the Supplier Standards after submitting an application under section 424.57(b)(1). The sole consequence listed is that "CMS revokes a supplier's billing privileges if it is found not to meet the standards." *Id.* § 424.57(e)(1). The regulation makes no mention of nonpayment of claims for failure to comply with the Supplier Standards. Revocation may follow non-compliance with the Standards and non-payment may follow revocation (pursuant to subsection (b)), but non-payment does not necessarily follow noncompliance and it may not, in any case, do so directly.

The overall structure of the Supplier Standards regulation therefore appears straightforward. Subsection (b) establishes both conditions of participation (i.e., submit an application for billing privileges) and conditions of payment (i.e., have approved application on file, not have privileges revoke at time of sale, etc.). Subsection 9(c) refines the conditions of participation of subsection (b) by saying what must be in the supplier's application for billing privileges—i.e., a promise to comply with the Supplier Standards. Subsection (e) provides the sole remedy for failure to live up to the conditions of participation in subsection (c)—revocation of billing privileges. Nothing in the regulation suggests that non-payment is a remedy for failure to comply with the Supplier Standards, suggesting that certification of compliance with the Supplier Standards is only a condition of participation.

---

11. The regulation also has subsections on surety bond requirements, § 424.57(d); a payment prohibition relating to CPAP devices, § 424.57(f); and a requirement to revalidate an application for billing privileges every three years, § 424.57(g). Those sections are not relevant to the present motions.

### b. Extrinsic Evidence

Although the regulations themselves undercut the relator's first liability theory, with all fact discovery now complete and in the summary judgment record, the court need not rely upon the structure of the regulations alone to conclude that the Supplier Standards are conditions of participation and not conditions of payment. Both the CMS–855S form promulgated by CMS and a letter sent by CMS to relator's counsel support this conclusion.

First, the actual CMS–855S form, which the relator submitted to the court (Docket # 322–27), supports treating the Supplier Standards as conditions of participation and not as preconditions of payment. The CMS–855S form is titled "Medicare Enrollment Application," Docket # 322–27 at 1—it is not a reimbursement form. The page within the application that lists the Supplier Standards is titled "DMEPOS Supplier Standards *for Medicare Enrollment.*" *Id.* at 2. It does not say "for Medicare *Payment.*" The form goes on to describe the Supplier Standards as "standards every Medicare DMEPOS supplier must meet *in order to obtain and retain their billing privileges.*" *Id.* Again, it does not mention payment. The language in the form, drafted by CMS, does not rule out the relator's condition of payment theory, but it provides no support for the relator's position and is entirely consistent with defendants'.

Second, as a follow up to a 2013 meeting between relator's counsel, CMS, the Department of Health and Human Services (CMS's parent agency), and the Department of Justice, CMS wrote a letter to relator's counsel addressing, "whether CMS and DOJ would support . . . plaintiff/relator['s] Motion for Summary Judgment arguing that a violation of 42

C.F.R. § 424.57(c)(5) ('supplier standard # 5') constitutes a false certification to Medicare that could form the basis of a False Claims Act . . . case." Docket # 273–3.[12] Although CMS declined to address the ultimate False Claims Act liability issue, instead deferring to DOJ, it explained that "it is CMS' position that the requirements of 42 C.F.R. § 424.57(c), which includes supplier standard # 5, are conditions of participation, *not conditions of payment.*" *Id.* at 1 (emphasis added). This unambiguous statement from the agency responsible for administering the Medicare program, which is consistent with the structure of the regulation and the language of the forms implementing it, dooms the relator's attempt to establish False Claims Act liability from violations of Supplier Standard No. 5.

### 2. Materiality

■ Even if the court were to assume that Supplier Standard No. 5 is a precondition of payment, the relator's False Claims Act liability theory still fails because it does not satisfy the materiality requirement. In the same 2013 letter to relator's counsel, CMS went on to say that "it is CMS' position that . . . a supplier's violation of supplier standard # 5 may lead to a revocation of that supplier's billing privileges, but *would not lead to a denial of payment* for claims submitted during the period he was in violation of that standard." Docket # 273–3 (emphasis added). In light of this unequivocal statement about the consequences of non-compliance from the agency that administers Medicare, a reasonable jury could not conclude that defendants' allegedly false certifications were capable of influencing CMS's decision to pay their claims.

---

**12.** Both the relator and defendants filed copies of the letter, but the relator's copy is filed under seal. Docket # 320–8. I therefore cite to defendants' copy, which is identical.

The relator advances two theories to sidestep CMS's clear policy statement, but each fails. First, the relator points to several other policy statements from CMS (and its predecessor, the Health Care Financing Administration) that allegedly conflict with the statement above. Having reviewed them, the court does not agree that any conflict exists. For example, the relator cites the summary accompanying the final rule containing the Supplier Standards regulation in the Federal Register, which says that the regulation as a whole "establishes additional standards for an entity to qualify as a Medicare supplier for purposes of submitting claims and receiving payment." Medicare Program; Additional Supplier Standards., 65 Fed.Reg. 60366, at 60366 (Oct. 11, 2000). This is true, but, as explained above, the regulation contains more than just the Supplier Standards—it also includes the payment rules in 42 C.F.R. § 424.57(b). A summary indicating that the regulation as a whole includes some conditions of payment does not mean that the Supplier Standards contained within a subsection of the regulation are conditions of payments. The relator next cites another Federal Register notice from CMS for the rule that "[i]n order to obtain a supplier billing number, a supplier must comply with certain supplier standards as identified by the Secretary." Medicare Program; Revisions to the Durable Medical Equipment, Prosthetics, Orthotics, and Supplies (DMEPOS) Supplier Safeguards, 77 Fed.Reg. 14989, 14989 (Mar. 14, 2012). This is again true, but misses the point. This notice says nothing about whether the government would pay a claim if the supplier were out of compliance with the standards. Neither of these documents speak to the issue that the 2013 letter addresses and that the relator's theory of liability turns on, *i.e.*, whether a violation of Supplier Standard No. 5 may influence the government's decision to pay a Medicare claim.

Next, the relator contends that CMS's position in the 2013 letter should not affect the materiality determination in this case because CMS's position was not public. In support of this theory, the relator cites two cases about regulatory interpretation: *Auer v. Robbins*, 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997), which held that an agency's interpretation of its own ambiguous regulations receives significant deference from a reviewing court, and *United States v. Lachman*, 387 F.3d 42, 54 (1st Cir.2004), which concluded that *Auer* deference is only appropriate if the agency's interpretation of its regulations is public. Relator misses the mark both because the regulation is not ambiguous and because they do not speak to the materiality inquiry. As explained above, section 424.57 in no way indicates that payment for claims will be withheld because of an enrolled supplier's non-compliance with the Standards. The 2013 letter simply confirms that, in practice, CMS is abiding by that interpretation of its regulations. With neither the regulations nor agency practice supporting his theory that non-compliance with the Supplier Standards would influence the government's payment of a claim, the relator has not shown that such a violation could be material in the False Claims Act context.

Finally, the relator contends that this court's earlier order on defendants' motions to dismiss precludes summary judgment on the Supplier Standard No. 5 liability theory. That order concluded that application of Supplier Standard No. 5 "directly affects the amount of money paid by the government for reimbursement claims." *Bierman*, 748 F.Supp.2d at 129. Although that ruling addressed the same issue that underlies defendants' current summary judgment motions, it did so in a

different way and does not preclude a ruling for defendants now. First, in the motion to dismiss order, the court did not conclude that a CMS–1500 certification after a CMS–855S certification would necessarily give rise to a False Claims Act claim. Rather, it concluded that "a supplier violates the False Claims Act if it certifies compliance with applicable conditions of participation by Medicare, *knowing at the time of certification that it would not abide by Supplier Standard Regulation Number 5." Id.* (emphasis added). That categorical statement concerns only false express certifications in the CMS–855S form, which are not the subject of the present motions. It does not concern false implicit certifications via the CMS–1500 forms. Second, and significantly, much has happened in the law since the court's 2010 decision. In 2011, the First Circuit clarified that a certification must concern a precondition of payment to be actionable under the False Claims Act. *Hutcheson,* 647 F.3d at 385. It further refined that standard earlier this year. *See Escobar,* 780 F.3d at 512. This intervening authority has made clear that the proper question for determining False Claims Act liability is whether non-compliance with a standard to which the defendant certified compliance would affect the government's decision to pay the defendant's claim. The court's motion to dismiss opinion does not address that question. Finally, this case is now in a different procedural posture than it was in 2010. With the aid of discovery (which turned up, among other things, the 2013 CMS letter), it is now possible to inquire into how the Supplier Standards regulation works in practice. As explained above, the Supplier Standards actually function only as conditions of participation and do not affect Medicare's payment decisions. Collectively, these developments permit the court to now conclude that compliance with the Supplier Standards is not a condition of payment of a Medicare reimbursement claim and is not material to the government's decision whether to pay a claim.

### 3. Related Authority

Recognizing that discrepancies exist among the circuits on the proper scope of the False Claims Act, the court has independently concluded, under First Circuit law, that defendants' alleged violations of Supplier Standard No. 5 are insufficient to support claims under the False Claims Act. I note, however, that this outcome is consistent with the decisions of all other courts that have addressed this question. Most recently, in allowing many of these same defendants' motions to dismiss a similar *qui tam* action, the Central District of California "c[ould] not find that violating § 424.57(c) will support the imposition of [False Claims Act] liability on defendants." *U.S. ex rel. Modglin v. DJO Global Inc.,* No. 2:12–cv–07152–MMM, 114 F.Supp.3d 993, 1019, 2015 WL 4111709, at *20, 2015 U.S. Dist. LEXIS 60812, at *62–65 (C.D.Cal. May 8, 2015). The theory advanced there was that the defendants' alleged failure to file a PMA supplement[13] with the U.S. Food and Drug Administration and off-label promotion of the stimulators violated Supplier Standard No. 1, which requires that a manufacturer applying for billing privileges from Medicare certify that it meets and will continue to meet "[f]ederal regulatory requirements that specify requirements for the provision

13. A PMA, or premarket approval, is the FDA process of scientific and regulatory review to evaluate the safety and effectiveness of certain medical devices. The PMA process begins with an application from the device maker. A PMA holder must submit a PMA supplement if it makes changes to the approved device or device label that affect the safety or effectiveness of the device.

of [durable medical equipment] and ensure accessibility for the disabled." *See* 42 C.F.R. § 424.57(c)(1)(i). The court concluded, as I have above, that § 424.57 "does not concern reimbursement, and contains its own internal sanction—i.e., loss of billing privileges [under] 42 C.F.R. § 424.57(e)." *Id.* at 1020, at *21, 2015 U.S. Dist. LEXIS 60812 at *65. "Accordingly," the court held, "relators' [False Claims Act] Medicare claim must be dismissed." *Id.*

The *Modglin* court is not alone in its reasoning. In *United States ex rel. Williams v. Renal Care Group, Inc.,* 696 F.3d 518, 531–32 (6th Cir.2012), the Sixth Circuit concluded that defendant dialysis suppliers' alleged violation of the certification requirements set forth in § 424.57(c) for billing privileges applications did not render their claims "materially false" under the False Claims Act because the certification of compliance was not a condition or prerequisite of payment. *See id.* ("The regulations set forth in [§ 424.57(c)] are conditions of participation, the violation of which do not lead to [False Claims Act] liability."). And, in *U.S. ex rel. Cooper v. Gentiva Health Servs., Inc.,* No. CV 01–0508, 2003 WL 22495607, at *9 (W.D.Pa. Nov. 4, 2003), the Western District of Pennsylvania rejected a relator's False Claims Act claim for violation of the supplier standards because "Section 424.57 makes abundantly clear that the proper redress for violations of the [supplier] standards established therein is not the denial of payment, but the revocation of the supplier's billing privileges." [14] The Sixth Circuit, Central District of Califor-

nia, and Western District of Pennsylvania each reached their conclusions based on the regulations alone, which this court declined to do at the motion to dismiss stage. Nonetheless, their reasoning is compelling, and it is only further supported by the extrinsic evidence that defendants have uncovered in this case.

The relator's theory of False Claims Act liability based on non-compliance with Supplier Standard No. 5 therefore fails on two separate and independent grounds: Supplier Standard No. 5 is not a condition of payment, and non-compliance with it is not material to the government's decision to pay a claim. Even if the relator can show that defendants did not comply with the Standard, no reasonable jury could conclude that defendants' allegedly false statements are sufficient to support liability under the False Claims Act. Defendants' motion is allowed with respect to the relator's Supplier Standard No. 5 theory of liability.

**B. Requirement to Rent**

■ Defendants next move for summary judgment on the relator's theory that they violated the False Claims Act by failing to offer a rental option for their bone growth stimulator devices. Relator's False Claims Act claim, although not well articulated, appears to be that defendants certified compliance with "all applicable Medicare laws, regulations and program instructions that apply to [them]" in their CMS–855S forms, and that offering a rental option is required, at least in these circumstances, by those laws and regulations. Defendants counter that failure to

14. At least one other court that has considered the consequences for violating the Supplier Standards in another context has reached a similar conclusion. *See Hansen v. Freedom Mobility, Inc.,* No. 5:08–CV–131–DCK, 2009 WL 3784958, at *2 (W.D.N.C. Nov. 10, 2009) (in negligence case, conclud-

ing that "[f]ailure to comply with regulations regarding billing or insurance might result in removal of Medicare billing privileges by the government, *see* 42 C.F.R. 424.57(c), but would not establish any tort or negligence liability," and making no mention of non-payment by the government).

offer a rental option for medical equipment like bone growth stimulator devices cannot form the basis for a False Claims Act claim under any circumstances. For the reasons that follow, I agree.

I again begin with the language of the regulations. The alleged "requirement to rent" is, in the relator's view, implicit in Supplier Standard No. 5. The Standard, as discussed extensively above, requires suppliers to "[a]dvise beneficiaries that they *may* either *rent* or purchase inexpensive or routinely purchased durable medical equipment, . . . as defined in § 414.220(a) of this subchapter." 42 C.F.R. § 424.57(c) (emphasis added). Section 414.220 defines "inexpensive equipment" as "equipment the average purchase price of which did not exceed $150 during the period July 1986 through June 1987," and it defines "routinely purchased equipment" as "equipment that was acquired by purchase on a national basis at least 75 percent of the time" during that same time period. *Id.* § 414.220(a)(1)-(2). The parties agree that the bone growth stimulator devices fall into one or both of these categories and are governed by section 414.220. Docket # 319 ¶ 26; *see also* Health Care Fin. Admin., Dep't of Health & Human Servs., Operating Instructions for Expanded Coverage of the Electrical Osteogenic Stimulator for Fracture Healing (Feb. 2000), *available at* http://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/downloads/AB000560.pdf ("The HCPCS code used for this device is E0747 (osteogenesis stimulator, electrical, non-invasive, other than spinal applications); the ICD–9 code is 733.82 . . . . This code will remain in the inexpensive and routinely purchased category . . . . ."). Section 414.220 goes on to set out the "payment rules" for "inexpensive or routinely purchased" devices. For devices in this category, Mediocare reimburses suppliers "on a monthly rental basis or in a lump sum amount for purchase of the item." 42 C.F.R. § 414.220(b)(1).

The statutes and regulations clearly contemplate a rental option for items like the bone growth stimulator devices. Yet, nothing in the regulations *requires* a supplier to offer a rental option or to seek reimbursement on a rental basis; they leave to the supplier's discretion the decision whether to sell or rent the device. Section 414.220(b) simply outlines the reimbursement methods, which are determined by the supplier's method of distribution. If supplier chooses to rent its devices, it may receive payment "on a monthly rental basis." Likewise, if it chooses to sell its device, it may receive payment "in a lump sum amount for purchase of the item." Put simply, the regulation is agnostic on which option a particular supplier chooses to offer.

Supplier Standard No. 5 is less clear, but still does not impose an affirmative rental obligation on suppliers. The Standard, by its plain text, simply requires the supplier to *advise* potential purchasers that they may be able to rent the device. It does not, however, suggest that the potential purchasers may be able to rent the device from the same supplier, nor does it suggest that they must be able to rent the device in practice. The relator's position that Medicare requires suppliers to furnish a rental option therefore finds no support in the governing Medicare regulations.

Although I need not rely on it because the regulations themselves are clear, the extrinsic evidence is even less helpful for the relator. In correspondence with another supplier, the director of the CMS group responsible for overseeing durable medical equipment suppliers took the position that "the supplier is not mandated to furnish both the purchase or rental op-

tion." Docket # 273–5 at 1. He noted that, in CMS's view, "[t]he statute mandates payment for some items on a purchase or rental basis but *does not mandate that suppliers make both options available.*" *Id.* (emphasis added). He even acknowledged there was "no guarantee [that a patient] will find a supplier that provides the item on either a purchase or rental basis if the industry as a whole does not furnish the item one way or the other," and closed by noting that a company is "perfectly within [its] rights to only offer [a device] on a purchase basis." *Id.* Although not dispositive because it was nonpublic, this interpretation of the regulations by the agency charged with administering them supports the above plain-meaning interpretation of the regulations' texts—*i.e.*, that a device supplier is under no obligation to offer a rental option.

In response, the relator contends that a rental requirement might have arisen if the government had known about defendants' other practices. But the relator offers no support in the statute, regulations, case law, or agency statements to support this springing rental requirement. Although the relator may have a False Claims Act claim based on those other alleged practices, like falsely documenting patients' medical needs, he cannot rely on defendants' failure to comply with an obligation that they did not have to support a False Claims Act violation. Defendants' motion is therefore allowed with respect to the relator's rental requirement theory of liability.

### C. Merits of Relator's Theories

 In footnotes, defendants suggests that the relator's continued pursuit of a "condition of payment" theory about

Supplier Standard No. 5 and his rental requirement theory are "clearly frivolous," entitling them to attorneys' fees under 31 U.S.C. § 3730(d)(4). *See, e.g.,* Docket # 272 at 2 n. 1, 3 n. 2. That section provides that a district court may award a defendant reasonable attorneys' fees against a *qui tam* relator "if the defendant prevails in the action and the court finds that the claim of the person bringing the action was clearly frivolous, clearly vexatious, or brought primarily for purposes of harassment." A claim is frivolous when, viewed objectively, it may be said to have no reasonable chance of success and present no valid argument to modify present law. *See, e.g., Mikes v. Straus,* 274 F.3d 687, 705 (2d Cir.2001). That is not the case here. There is no case law from this circuit addressing Supplier Standard No. 5 or a requirement to rent in the False Claims Act context, and both sides in this case advanced plausible arguments supporting their theories. A fee award is therefore not appropriate.

### IV. Conclusion

DJO's and EBI's motions for partial summary judgment (Docket # # 268 and 271) are ALLOWED, as are the two pending administrative motions (Docket # # 339 and 347).[15]

---

**15.** Docket # 339 is DJO's motion to join EBI's reply in support of its motion for a protective order, which I have already re-

solved. Docket # 347 is the relator's motion to file a reply to defendants' notices of supplemental authority.